Harvey PUGH, Plaintiff–Appellant,

v.

Otis R. BOWEN, M.D., Secretary of Health and Human Services, Defendant–Appellee.

No. 87–2752.

United States Court of Appeals, Seventh Circuit.

Argued April 13, 1988.

Decided March 20, 1989.

Jeffrey A. Rabin, Pfeffer Becker & Cerveny, Ltd., Chicago, Ill., for plaintiff-appellant.

Linda E. Tucker, Asst. Regional Counsel, Dept. of Health and Human Services, Chicago, Ill., for defendant-appellee.

Before MANION and KANNE, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

KANNE, Circuit Judge.

Harvey Pugh filed an action in the district court seeking judicial review of the Secretary's final decision upon his application for disability benefits. The Secretary awarded disability benefits to Pugh. However, Pugh disagrees with the Secretary regarding the disability's date of onset. The district court granted the Secretary's motion for summary judgment and Pugh appeals. We affirm.

## I. BACKGROUND

Harvey Pugh worked at the Nalco Chemical Company for approximately eighteen years. His job required him to lift materials which sometimes weighed as much as 100 pounds, operate levers, and shovel and rake materials on the floor, as well as mix chemicals and set scales. In March of 1982, Pugh left his job permanently after suffering a blackout episode at work, apparently caused by emphysema.

On October 27, 1982, Pugh filed his first of three applications for a period of disability and disability insurance benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423. He alleged that he became disabled and unable to work as of March 31, 1982, at age 48, due to "emphysema" and "hypertension." This application was denied at the initial determination level of administrative consideration and was not appealed.

Pugh filed a second application for disability benefits on September 16, 1983. It contained the same allegations as his first application. This application was denied at both the initial and the reconsideration levels of administrative consideration. Pugh subsequently requested a hearing before an Administrative Law Judge. However, the ALJ dismissed the request on September 26, 1985, when Pugh failed to appear at the hearing. This order was not appealed, either to the administrative appeal body or federal court.

This case involves Pugh's third application for a period of disability and disability insurance benefits filed on April 19, 1985. He again alleged that he became disabled and unable to work as of March 31, 1982, because of emphysema and high blood pressure. His claim again was denied at the initial and reconsideration levels of consideration. Subsequently, Pugh requested a hearing before an Administrative Law Judge.

On April 7, 1986, an ALJ conducted a hearing upon Pugh's application which Pugh and his attorney attended. The ALJ heard testimony from Pugh, his friend, Gail Denise Alford, and Richard J. Hamersma, a vocational expert. He also considered addi-

tional vocational evidence, as well as medical evidence from treating physicians and nonexamining medical experts. This evidence covered Pugh's physical condition and vocational aptitude from March, 1982, through November, 1985.

After the ALJ conducted the hearing, but prior to issuing a decision, Pugh requested the ALJ to "reopen" his second application and reconsider the Secretary's prior decision. He alleged that the regulations allow for reopening within one year of the initial determination for any reason, 20 C.F.R. § 404.988(a), and within four years of the decision upon a showing of "good cause," 20 C.F.R. § 404.988(b). Pugh contended that "new and material evidence" existed to support his assertion that the ALJ should exercise his discretion to reconsider the Secretary's prior decision. 20 C.F.R. § 404.986(a)(1).

The ALJ issued his decision on June 11, 1986. He found that Pugh has not engaged in "substantial gainful activity" since March 31, 1982. He also found that Pugh presently suffers from "severe chronic obstructive pulmonary disease and hypertension." He further found that prior to November 2, 1985, Pugh had the residual functional capacity to perform "light" work activities. The ALJ noted that although Pugh may have experienced some discomfort and periodic pain prior to November of 1985, his condition was not so severe as to preclude the performance of all substantial gainful activity. However, since November 2, 1985, Pugh's disabling impairment has met the Listing of Impairments ("Listing 3.02 of Appendix 1, Subpart P, Regulations No. 4"). He therefore is presumed disabled and entitled to benefits as of that date.

The ALJ also stated in his decision that because he had determined that the disability's onset date was November, 1985, rather than March of 1982, as the second application alleged, it "would not be appropriate" to reopen the prior application. He also stated that reopening the second application was "unwarranted."

On December 2, 1986, Pugh filed an appeal with the Appeals Council. The Appeals Council adopted the ALJ's ruling as the Secretary's final decision.

On February 2, 1987, Pugh filed for review of the Secretary's decision in federal district court. He asserted that the ALJ erroneously refused to reopen the prior application. Furthermore, substantial evidence did not support the ALJ's finding that November 2, 1985, was the onset date of his disability rather than March 31, 1982. Pugh argued that the ALJ improperly relied solely upon Pugh's ability to meet the regulations' Listing of Impairments rather than the totality of the subjective testimony and the medical and vocational evidence.

On September 3, 1987, Judge Zagel found that the district court was without jurisdiction to review the ALJ's decision not to reopen the prior application, citing *Califano v. Sanders*, 430 U.S. 99, 107–09, 97 S.Ct. 980, 985–86, 51 L.Ed.2d 192 (1977), and *Watters v. Harris*, 656 F.2d 234, 238 (7th Cir.1980). *Pugh v. Bowen*, 670 F.Supp. 812, 813 (N.D.Ill.1987). He also held that the Secretary's decision was supported by substantial evidence. He then granted the Secretary's motion for summary judgment and denied Pugh's motion for summary judgment.

## II. THE APPEAL

The parties do not dispute that Pugh currently is disabled. Pugh only appeals the established onset date of his disability. Pugh contends that the ALJ refused to apply the provisions of Social Security Ruling 83–20 to determine the onset date of his disability. He argues that when the requisite analysis is performed substantial evidence does not exist to support the ALJ's determination that November 2, 1985 was the onset date of his disability, rather than March 31, 1982, when he left his job at the Nalco Chemical Company. Pugh believes that the ALJ improperly determined the onset date based solely upon Pugh's ability to meet the disability "Listings," and refused to take into account vocational factors, symptoms, and subjective testimony. We address his contentions below.

## A. *Standard of Review* [1]

The Social Security Act specifically provides that "the findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); *see also Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir.1988); *Ray v. Bowen*, 843 F.2d 998, 1001 (7th Cir.1988); *Walker v. Bowen*, 834 F.2d 635, 639 (7th Cir.1987); *Burnett v. Bowen*, 830 F.2d 731, 734 (7th Cir.1987).[2] We "may not decide the facts anew, reweigh the evidence or substitute our own judgment for that of the ALJ." *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir.1987) (citation omitted). We therefore may reverse the ALJ's holding only if he has made an error of law. *See, e.g., Steward v. Bowen*, 858 F.2d 1295, 1297 (7th Cir.1988); *Veal v. Bowen*, 833 F.2d 693, 696 (7th Cir.1987); *Waite v. Bowen*, 819 F.2d 1356, 1360 (7th Cir.1987); *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). With these limitations in mind, we turn to the issues presented in this appeal.

## B. *The ALJ's Decision*

In *Lichter v. Bowen*, 814 F.2d 430, 434-37 (7th Cir.1987), we held that an ALJ is required to apply the analysis outlined by Social Security Ruling 83-20 ("SSR 83-20") to determine the onset date of an applicant's disability. 814 F.2d at 434-37. To determine the onset date of "disabilities of a nontraumatic origin," such as Pugh's disability, SSR 83-20 requires an ALJ to consider three factors.

First, an ALJ should consider the individual's allegations regarding the onset date. SSR 83-20 at 95 ("[T]he starting point in determining the date of onset of disability is the individual's statement as to when disability began."); *Lichter*, 814 F.2d at 434. Second, the ALJ should consider the applicant's work history. SSR 83-20 at 95 ("The date the impairment caused the individual to stop work is frequently of great significance in selecting the proper onset date."); *Lichter*, 814 F.2d at 434. Third, the ALJ should consider all medical and other relevant evidence. SSR 83-20 at 94, 95-96; *Lichter*, 814 F.2d at 434.

The ALJ must weigh these factors in light of SSR 83-20's other directives. An "individual's allegation or the date of work stoppage is significant in determining onset only if it is consistent with the severity of the condition[s] shown by the medical evidence." SSR 83-20 at 94 ("Policy Statement"). However, "in the case of slowly progressive impairments, it is not necessary for an impairment to have reached listing severity (i.e., be decided on medical grounds alone) before onset can be established. In such cases, consideration of vocational factors can contribute to the determination of when the disability began...." SSR 83-20 at 96. Nevertheless, "the medical evidence serves as the primary element in the onset determination" and the date chosen "can never be inconsistent with the medical evidence of record." *Id.* at 95; *Lichter*, 814 F.2d at 434.

The ALJ did not refer to SSR 83-20 specifically in his decision. However, if the ALJ nevertheless conducted the requisite analysis, his failure to refer to SSR 83-20 by name should not be fatal. *See Lichter*, 814 F.2d at 435 (implying that an ALJ need not refer to SSR 83-20 specifically if he applies the requisite analysis). We therefore must determine whether the ALJ properly considered all of the relevant evidence of record as he made the disability determination.

The Social Security Act provides that a claimant is not disabled until he is unable to engage in "substantial gainful activity" because of a physical or mental impairment

---

1. Because the Secretary has delegated his authority to make final decisions to the Appeals Council, *see* 20 C.F.R. §§ 404.900, 404.981, 416.-1400, 416.1481, we must "review the decision of the Appeals Council rather than the decision of the ALJ." *See Arbogast*, 860 F.2d at 1402 (citations omitted). However, because in this case the Appeals Council explicitly adopted the opinion of the ALJ, we must determine whether substantial evidence supports the ALJ's decision. *Id.*

2. Substantial evidence is such relevant evidence which a reasonable mind might accept as adequate to support a conclusion. *Richard v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *see also Steward v. Bowen*, 858 F.2d 1295, 1297 (7th Cir.1988).

for a continuous period of at least twelve months. 42 U.S.C. §§ 416, 423. To determine whether a claimant is disabled within the meaning of the Act, the Secretary has developed a five-step sequential evaluation process. We have described the inquiry as follows.

The following steps are addressed in order. (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant able to perform any other work within the economy?

An affirmative answer leads either to the next step, or on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops [the] inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520.

*Garfield v. Schweiker,* 732 F.2d 605, 607 n. 2 (7th Cir.1984); *see also Steward v. Bowen,* 858 F.2d 1295, 1297 (7th Cir.1988); *Arbogast,* 860 F.2d at 1403 n. 1.

█ The ALJ's decision first noted that Pugh has been unemployed since March of 1982 when he left his job at the Nalco Chemical Company. Thus, Pugh satisfied step one of the inquiry throughout the relevant period. Furthermore, the ALJ apparently found that Pugh's alleged disabling impairments qualified as "severe" under the Act throughout the same period.[3] Thus, Pugh also satisfied step two.

After finding that Pugh's impairment did not qualify for the step three disability presumption until November of 1985, the ALJ proceeded to evaluate Pugh's contention at step four of the inquiry. At this step, the ALJ considered the vocational opinion of an expert, Richard Hamersma,

who characterized Pugh's former occupation as "heavy" and "unskilled." Based upon this evidence and the medical evidence of record, including a report prepared by Jeff Edmonds, a Vocational Assessment Specialist, the ALJ concluded that Pugh had been unable to perform his former occupation for some time, possibly even since March of 1982.

At step five, the Secretary has the burden of proving that a claimant retains the residual functional capacity ("RFC") to perform other work existing in the national economy. *Caldarulo v. Bowen,* 857 F.2d 410, 413 (7th Cir.1988). The ALJ found that Pugh maintained the RFC to perform "light work activities"[4] prior to November of 1985, at which time he satisfied the Listings and was presumed disabled without any further inquiry.

The ALJ considered a large amount of evidence in rendering his decision that Pugh could perform light work. He was confronted by a wealth of information to determine which of numerous onset dates, if any, was appropriate, including subjective personal testimony, two vocational experts' testimony, and extensive medical documentation.

Pugh testified that since leaving his job in March of 1982 his physical condition has deteriorated substantially. His periodic symptoms normally include some combination of fatigue, pain, shortness of breath, and dizziness. He testified that he cannot perform ordinary housework or shopping, an observation which his friend, Gail Denise Alford, confirms. He also believes that dust and odors cause him to cough persistently. He further testified that he occasionally uses a medicated spray for breathing relief and sometimes takes nitroglycerin to relieve sporadic chest pain.

---

**3.** "An impairment ... is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a).

**4.** The regulations' "Physical Exertion Requirements" section defines "light work" as involving: lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight

lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the applicant] must have the ability to do substantially all of these activities.
20 C.F.R. § 404.1567(b).

The record indicates that from early 1982 to late 1985, at least five different physicians personally examined Pugh. At least two other physicians reviewed his medical records and issued diagnostic opinions. Their opinions do not differ substantially.

In May, 1982, Dr. Pardo, reported that Pugh suffered from "moderately severe" chronic obstructive lung disease, that his electrocardiogram was somewhat abnormal, that his chest x-ray revealed emphysema, and that he suffered from slightly high blood pressure. At that time, Pugh still worked and smoked a half of a pack of cigarettes daily. In November, 1983, Dr. Pardo again reported that Pugh suffered from high blood pressure and interpreted pulmonary function studies as showing moderate obstructive lung defect with only mild response to bronchodialators. At that time, Dr. Pardo diagnosed acute exasperation of chronic obstructive lung disease, sinus bradycardia, hypertension, and possible septal fibrosis.

Finally, in April of 1985, Dr. Pardo completed a "Respiratory Report," stating that Pugh's current diagnosis was "bronchitis-asthma and severe obstructive lung disease." He reported that Pugh experienced asthma attacks twice a month. He found no pulmonary edema, enlargement of the liver or peripheral edema. In an accompanying "Cardiac Report," Dr. Pardo stated that Pugh suffered chest pain with exertion or emotional stress which was relieved with rest and nitroglycerin. Dr. Pardo also reported some damage to Pugh's eye grounds, but did not report the extent of the damage.

In November of 1982, Dr. Long examined Pugh at the request of the Social Security Administration. Dr. Long reported that Pugh's emphysema had been diagnosed eight or nine years previously but that there was no history of respiratory failure. She also reported that Pugh's high blood pressure had been diagnosed twelve years earlier and that his blood pressure had risen since May. She also reported that Pugh demonstrated full range of motion of all joints and was pain free in all joints. Although she could find no known provoking factors to Pugh's chest pain, she diagnosed "hypertensive cardiovascular disease with complaints of chest pain that appeared to be noncardiac in origin" and "by history, emphysema."

In June of 1985, Dr. Long again examined Pugh. She again noted hypertension, moderate obstructive lung disease, possible restrictive lung disease, elevated blood pressure, and an abnormal EKG. The etiology of Pugh's chest pains was unclear and "possibly noncardiac in origin." Her pulmonary testing revealed findings which almost, but not quite, equalled the Listing of Impairments for pulmonary impairments.[5]

The ALJ also considered the opinions of two nontreating physicians. In June of 1985, Dr. Kim examined the medical evidence of record and concluded that Pugh retained the residual functional capacity to lift or carry up to twenty-five pounds frequently and up to a maximum of fifty pounds. He thought that Pugh could stand or walk six hours and sit six hours of a typical eight hour work day, and that Pugh was capable of pushing and pulling hand and foot controls of up to fifty pounds. Dr. Kim further opined that Pugh was able

---

5. The ALJ also considered the medical testimony of two other examining physicians. In January of 1983, Dr. Fallah, a specialist in gastroenterology and internal medicine, treated Pugh after he was hospitalized for shortness of breath, marked wheezing in both lungs, and a productive cough with blood-tinged sputum. Dr. Fallah diagnosed chronic obstructive pulmonary disease with bronchopneumonia. In August of 1983, Pugh was again admitted into the hospital for shortness of breath, a productive cough, and chest pains.

In April, 1984, Dr. Brasch, a specialist in internal medicine, examined Pugh after he com-

plained of shortness of breath, chest pains, and hypertension. Dr. Brasch opined that Pugh's clinical descriptions of his chest pain suggested chronic pulmonary emphysema rather than problems of a cardiac origin. He found that Pugh's blood pressure was in the "moderately to markedly" elevated range. However, there was no evidence of any enlargement of the heart or of congestive heart failure. Dr. Brasch did note an early degree of hypertensive retinopathy (defined as any type of noninflammatory disease of the retina). Musculoskeltal and neurological examinations were normal.

to tolerate fumes generally associated with normal working conditions. On November 20, 1985, Dr. Bernet also reviewed the evidence of record and agreed with Dr. Kim's conclusions, although Dr. Bernet added a limitation that Pugh should avoid "excessive" dust and fumes.

The ALJ also considered the vocational evidence of record. Jeff Edmonds' July, 1985 report supported Dr. Kim and Dr. Bernet's opinions. The Vocational Assessment Specialist opined that Pugh could perform other "medium" work in the national economy, based upon Pugh's RFC, his age, education and prior work experience. He likewise opined that Pugh should avoid "excessive" dust and fumes and suggested numerous jobs which he thought Pugh could perform.

█ Based upon the foregoing evidence, the ALJ concluded that the evidence indicated that Pugh could perform at least "light" work prior to qualifying for the disability presumption in November, 1985. Thereafter, the ALJ referred to the grid to determine whether Pugh was disabled.[6] The grid directed a finding of "not disabled" based upon Pugh's physical capacity, age, education, and work experience.

Pugh argues that the ALJ's finding that he was able to perform "light" work on November 1, 1985, and was totally disabled—including the inability to perform even "sedentary" work—on November 2, 1985, is "ludicrous."[7] We agree with the Secretary that Pugh fails to appreciate how the sequential evaluation process operates. As stated above, when a claimant's impairments meet the Listing of Impairments, the ALJ *presumes* that the claimant is disabled —and therefore entitled to benefits—without inquiring into the claimant's actual ability to perform some level of gainful employment. Thus, the ALJ might have found that Pugh was not "disabled" within the meaning of the Act if he had performed the same analysis on November 2, 1985, which he was required to perform on November 1, 1985.[8]

Pugh also contends that the ALJ's decision that Pugh could perform "light" work contradicts the testimony of the vocational expert, Mr. Hammersma. Based upon a hypothetical question which asked him whether an individual with "an exertional capacity for *sedentary* work only, could perform a significant number of jobs in the economy," Mr. Hamersma replied that only a limited number of jobs existed. However, no one questioned him concerning the availability of "light" work in the economy.

Thus, contrary to Pugh's assertions, Mr. Hamersma's opinion did not contradict the ALJ's finding because Mr. Hamersma's opinion did not address the facts of this case. Only if the ALJ had found that Pugh could perform "sedentary" work and had decided that a significant number of jobs in fact existed in the economy would his conclusions be inconsistent with the vocational expert's testimony. As a result, once the

6. Use of the grid is not appropriate where a claimant's non-exertional impairments preclude the claimant from performing the full range of work in any given exertional level. However, an ALJ is "permitted to conclude that a non-exertional limitation, while present, has no significant impact on a claimant's capacity to perform the range of work the individual is otherwise exertionally capable of performing...." *Caldarulo v. Bowen*, 857 F.2d 410, 413 (7th Cir. 1988) (quoting *Smith v. Scweiker*, 735 F.2d 267, 272 n. 3 (7th Cir.1984)). Because the ALJ relied upon the opinions of Dr. Bernet and Dr. Kim to conclude that Pugh should only avoid "excessive" amounts of respiratory irritants, rather than most work environments, the grid could be utilized to determine whether he was disabled. *See, e.g., id.; Warmoth v. Bowen*, 798 F.2d 1109, 1111–12 (7th Cir.1986) (discussing SSR 85–7); *see also* SSR 85–15.

7. When one employs this same reasoning with regard to Pugh's allegation that he became totally disabled upon the day he left his job at the Nalco Chemical Company, one might characterize Pugh's contention similarly.

8. Such a conclusion is not unsupported by the record in this case. Dr. Kim's opinions that Pugh could perform light, if not medium, work in the national economy came at a time when Pugh's impairments almost equalled the Listings. We do not believe that Dr. Kim's conclusions reflect an unqualified expert as Pugh asserts, especially when Dr. Bernet and Jeff Edmonds apparently supported Dr. Kim's assessment of the evidence.

ALJ concluded that Pugh could perform "light" work, he properly relied upon the grid to determine the available number of jobs.

Pugh also believes that the ALJ's decision completely ignores his subjective testimony concerning his symptoms. He argues that "[n]owhere in his decision does ALJ assess the effects of the symptoms afflicting the Plaintiff in 1982 and 1983 on the ability to perform light work." Thus, the ALJ must have refused to consider the evidence.

■ We do not believe that Pugh's arguments are correct. An ALJ "need not provide a written evaluation of every piece of evidence that is presented." *Steward*, 858 F.2d at 1299. Instead, he need only "minimally articulate" his assessment of the evidence. *Id.* We believe that the ALJ met this standard. Contrary to Pugh's assertions, the ALJ, after discussing the medical evidence, did evaluate Pugh's subjective complaints in light of that evidence. He specifically discussed Pugh's symptoms of dizziness and breathing difficulties and concluded that the symptoms did not preclude the performance of light work activities. ALJ's Decision at 4 (June 11, 1986). Therefore, the ALJ did not ignore Pugh's testimony. Instead, he "simply found that these complaints were not fully credible to the extent that they would prevent [him] from [performing all substantial gainful employment in the economy]." *Steward*, 858 F.2d at 1302. Stated differently, the ALJ did not "dispute the maladies claimed by [Pugh]; rather, he merely disagreed with [his] contention that, as a result of [those maladies], [Pugh] was disabled...." *Arbogast*, 860 F.2d at 1407 n. 8.

Furthermore, we do not think that the evidence of record clearly contradicts the ALJ's determination that Pugh maintained the capacity to perform "light" work activities prior to November of 1985. The ALJ correctly found that prior to November the medical evidence indicated that Pugh's diagnosed hypertension had not resulted in any significant end organ damage, congestive heart failure or ischemic heart disease. Furthermore, although Pugh alleged he experienced occasional chest pain, the doctors had not found the pain to have a cardiac origin. We agree with the ALJ's conclusions that Pugh may have suffered some pain and discomfort. The medical record indicated that Pugh's emphysema and high blood pressure had been diagnosed eight and twelve years respectively prior to leaving his job at the Nalco Chemical Company. However, we are unable to challenge the ALJ's conclusions that Pugh's symptoms were not so severe as to preclude the performance of "all gainful activity."

■ This case does not resemble *Lichter* where the claimant was undoubtedly disabled for some substantial period of time before he sought medical attention for his mental illness. In that case, the ALJ refused to consider the applicant's allegations concerning the onset date because the record did not contain any medical evidence for the relevant time period. In contrast, the ALJ in this case was forced to analyze an overabundance of medical and nonmedical evidence generated between early 1982 and late 1985 and to choose an appropriate onset date. We believe that the ALJ considered Pugh's allegation of a March, 1982, onset date ("the starting point") and found that the medical evidence ("the primary evidence for determining onset") contradicted his allegation. We therefore conclude that the ALJ correctly applied the analysis dictated by SSR 83–20.[9]

We also do not believe the ALJ's decision reveals any internal inconsistencies. His thoughtful and well-reasoned analysis causes us to agree with the district court's determination that substantial evidence supports his decision. As one court stated, although " 'the [Secretary] could have chosen an earlier onset date ..., the question

9. In cases where it is not possible to infer the onset date based upon the medical evidence, or to determine how long the disease has existed at a disabling level of severity prior to the date of the first recorded medical examination, the ALJ "should call on the services of a medical advisor when onset must be inferred." Because the ALJ had a relatively complete medical chronology of Pugh's medical condition from early 1982 through late 1985, the ALJ had no need for the services of an additional medical expert as Pugh now contends.

we face is whether the chosen onset date is supported by substantial evidence, not whether an earlier date could have been supported.'" *Villa v. Heckler,* 797 F.2d 794, 797 (9th Cir.1986) (quoting *Swanson v. Secretary of Health & Human Services,* 763 F.2d 1061, 1065 (9th Cir.1985)). We believe that the ALJ conducted the analysis required by SSR 83–20 and the sequential evaluation process and reached a reasonable conclusion concerning the onset date.[10]

### III.  CONCLUSION

We are unable to conclude, as Pugh contends, that the ALJ's decision is not supported by substantial evidence.  The ALJ's findings indicate that he applied the analysis dictated by SSR 83–20 and that he considered all relevant evidence.  The district court's decision therefore is AFFIRMED.

FAIRCHILD, Senior Circuit Judge, concurring in part, dissenting in part.

I agree that there was evidence to support a finding that as of June 12, 1985, Pugh was not disabled.  His pulmonary function tests on that date produced results which failed to establish disability, and up to then there was other evidence that he had the residual functional capacity to perform light work activities.  On November 2, 1985 his pulmonary function test produced results which established disability.  With all respect, it seems clear that his pulmonary function capacity must have deteriorated progressively during this period, and must have crossed the disability line at some date between June 12 and November 2.  It would be necessary to infer the probable date.  "At the hearing the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred."  SSR 83–20.

---

10.  Pugh also argues that, contrary to the district court's "*dicta* statement" and the appellee's assertions, administrative res judicata does not bar a March, 1982, onset date.  Because the onset date determined by the ALJ was subsequent to the final decision on the earlier applications, Pugh contends that his request to reopen those applications was mooted—that is, that the ALJ never reached the issue and we can find a March, 1982, onset date.  The Secretary argues that the ALJ fully considered, and declined, Pugh's request to reopen the second application.  Because we hold that substantial evidence supports the ALJ's decision, we need not address this issue.