51 F.3d 275
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Donald INMON, Plaintiff-Appellant,
v.
Donna E. SHALALA, Defendant-Appellee.
 No. 94-3516.
 United States Court of Appeals, Seventh Circuit.
 Argued Feb. 23, 1995.
Decided March 29, 1995.
 
 Before CUDAHY, COFFEY and MANION, Circuit Judges.
 
 ORDER
 
 1
 Appellant Inmon has a long history of knee and wrist problems which he claims entitle him to Social Security Disability Insurance (SSDI) benefits. He first applied for these benefits in early 1990, but was denied. He re-applied in December of 1991, but the Social Security Administration (SSA) again denied his request. Appellant Inmon then requested a reconsideration hearing, and on February 23, 1993 the Administrative Law Judge (ALJ) affirmed the denial of his second claim for benefits. The district court affirmed the ALJ's ruling, and Inmon now appeals to this court. We affirm.
 
 I. Facts
 
 2
 Inmon is a 54 year old man with an eighth grade education and some training as a welder. He has worked as a welder, carpenter and manager of a trailer park, but has a long history of knee and wrist problems that he claims have made his employment increasingly problematic. A summary of that history is set forth below.
 
 A. Wrist
 
 3
 Inmon's wrist problems began in February 1987, when he injured his right wrist while using a hammer. The record does not contain any mention of this injury, however, until November 1989, when he consulted a doctor about twisting pain in his right wrist. In January 1990 he was referred to Dr. Palmer, still complaining of pain, numbness and "catching" in the wrist. At that time, Dr. Palmer diagnosed a "nonunion ulnar styloid fracture with dorsal instability distal ulna [and] tear of the triangular fibrocartilage," Tr. 248, and performed surgery to repair the fracture and tear. In May of 1990, Dr. Palmer noted that Inmon was still experiencing weakness of grip, and in June he noted that Inmon complained of progressively worsening numbness and tingling in the hands. On July 5, 1990, Dr. Palmer performed a carpal tunnel operation on Inmon's right wrist. In September of that year, Dr. Palmer observed that Inmon complained of weakness in his hand. However, he released Inmon to work "with light duty." Tr. 270. In November of 1990, Dr. Palmer noted that Inmon's grip strength had diminished. Inmon continued to report similar problems into January of 1991. However, these problems did not cause any change in Dr. Palmer's assessment of Inmon's work capability.
 
 B. Knee
 
 4
 Inmon also has a long history of problems with his left knee. It was first injured in a work-related fall in March of 1988. An arthroscopy was performed on the knee in that same year, and Dr. Phillips performed a second arthroscopy in March of 1989. Dr. Phillips then recommended continued rehabilitation of Inmon's knee, but throughout that year Inmon continued to complain of pain and "locking up" of the joint. Inmon underwent a third arthroscopy on March 1, 1990, and although he continued to complain of pain and swelling, Dr. Phillips concluded that the knee was continuing to improve.
 
 
 5
 On January 16 and 17, 1991, the Institute of Physical Medicine and Rehabilitation performed a nine-hour evaluation of Inmon's medical condition and his ability to work. During that time, his knee did not give out, although he complained of pain. The Institute found that Inmon had full range of motion in the knee, that he was "functioning at Light-Medium level of physical demands" which meant that he could frequently lift 10 pounds or less, infrequently lift 35 pounds and walk at three miles per hour with no load or at a slower speed with 20 pounds or less. Tr. 291. Further evaluation of the knee was also recommended.
 
 
 6
 In November 1991, a new doctor, Dr. Kraft, reported that Inmon had a good range of motion in the knee. However, Inmon also still complained of pain, and on January 13, 1992 Dr. Kraft performed another arthroscopy. There is no indication in the record whether Inmon was better or worse after this procedure. In February of 1992 Inmon was evaluated by yet another physician, Dr. Savegnago in Canton, Illinois, who diagnosed him with degenerative joint disease. Dr. Kraft, in March 1992, concluded that Inmon was no better following the last arthroscopy, that he probably would never do much better, and that he "can and should be re-evaluated with Work Hardening and retrained to a more sedentary type occupation. The patient is physically able to return to some gainful occupation on a sedentary basis but not in his former job." Tr. 292. Inmon then apparently moved to Canton and continued to see Dr. Savegnago. Dr. Savegnago, in a letter dated September 1992, stated that he agreed with Dr. Kraft's assessment and that "the patient might be able to be retrained at a sedentary type occupation, but not to his former job as an iron worker." Tr. 331.
 
 
 7
 Inmon first applied for SSDI benefits in December 1990, alleging disability as of January 10, 1990 due to knee and wrist problems. This application was denied, and the denial was reaffirmed on Inmon's request for reconsideration. Inmon then filed a new application for benefits in December of 1991, this time alleging that he became disabled on January 10, 1989 but listing the same complaints. The ALJ denied this request for benefits, as did the district court. Inmon now appeals that decision.
 
 II. Discussion
 
 8
 To qualify for SSDI benefits, an applicant must establish that he is "disabled." A disabled individual is one who is unable to engage in "any substantial gainful activity by reason of any medically determinable physical ... impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. Sec. 423(d)(1)(A). Social security regulations outline a five step process for determining whether a person is disabled. Pope v. Shalala, 998 F.2d 473, 477 (7th Cir.1993). The following steps must be assessed in order: 1) is the claimant presently unemployed; 2) is the claimant's impairment "severe"; 3) does the impairment meet or equal an impairment listed by the Secretary; 4) can the claimant perform his past work, and 5) is the claimant capable of performing any work in the national economy. Id.; see also Steward v. Bowen, 858 F.2d 1295, 1297 (7th Cir.1988); 20 C.F.R. Sec. 1520. If questions 1 through 3 are answered in the affirmative, the claimant is found to be disabled. A negative answer to any question other than at step 3 ends the inquiry and results in a determination that the claimant is not disabled. Id. Further, once a claimant is determined to be unable to perform his past work, "the burden shifts to the Secretary to show the claimant can engage in some other type of substantial gainful employment." Lee v. Sullivan, 988 F.2d 789, 792 (7th Cir.1993).
 
 
 9
 Inmon first argues that the ALJ did not adequately evaluate whether he met or equaled Listings 1.12 and 1.13 under step 3. He also asserts that the ALJ's conclusions that he can perform light work and that he can perform a significant number of jobs in the national economy are not supported by substantial evidence. We review these issues under a substantial evidence standard; the ALJ's decision will not be reversed if it is supported by "more than a mere scintilla" of the evidence, or by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Steward, 858 F.2d at 1297. "We may not decide the facts anew, reweigh the evidence or substitute our own judgment for that of the ALJ." Pugh v. Bowen, 870 F.2d 1271, 1274 (7th Cir.1989).
 
 A. Articulation of Reasoning
 
 10
 Inmon first claims that the ALJ failed to consider whether he met or equaled Listings 1.12 and 1.13 because the ALJ did not specifically articulate reasons for rejecting those listings. This circuit has only required that an ALJ "minimally articulate his or her justification for rejecting or accepting specific evidence of a disability." Pope, 998 F.2d at 481; Steward, 858 F.2d at 1299. Here, the ALJ found that
 
 
 11
 The medical evidence establishes that the claimant has severe residuals of two surgeries on the right wrist and four surgeries on the left knee plus dysthymia and borderline intelligence, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.
 
 
 12
 Tr. 23.
 
 
 13
 This finding is equally, if not more, specific than the articulation we determined to be sufficient in Waite v. Bowen, 819 F.2d 1356, 1359 (7th Cir.1987). There the ALJ concluded that
 
 
 14
 The medical evidence establishes that the claimant has a loss of motor and sensory functions of the left arm, but he does not have an impairment, or a combination of impairments listed, or medically equal to one listed in Appendix Subpart P, of Social Security Regulations No. 4.
 
 
 15
 We thus find the ALJ's discussion of the issue to be "sufficient articulation to demonstrate that the ALJ considered the issue" whether Inmon met, or presented the medical equivalent of, the requirements of Listings 1.12 and 1.13. Id.
 
 B. Listing 1.12
 
 16
 We also agree with the ALJ and the district court that Inmon's impairments are not equal or equivalent to the requirements of 1.12 or 1.13. Listing 1.12 states:
 
 
 17
 Fractures of an upper extremity with non-union of a fracture of the shaft of the humerus, radius, or ulna under continuing surgical management directed toward restoration of functional use of the extremity and such function was not restored or expected to be restored within 12 months after onset.
 
 
 18
 20 C.F.R. Part 404, Subpart P, Appendix 1 (pt. A) Sec. 1.12 (1993).
 
 
 19
 Inmon asserts that his injuries meet this listing because he had surgery in 1990 for a fracture of his wrist incurred approximately two years earlier.[1] However, this surgery was for a non-union fracture of the right ulnar styloid. Tr. 239, 248. The fracture was thus to the styloid process, or the end, of Inmon's right ulna. Gerald J. Tortora, Principles of Human Anatomy 168 (6th ed 1992). However, Listing 1.12 concerns injuries to the shaft, the "long slender part [of the bone], such as ... the portion of a long bone between wider ends or extremities." Dorland's Illustrated Medical Dictionary 1514 (28th ed. 1994). Thus Inmon's injury does not fall into the category addressed by Listing 1.12. This difference reflects substantial evidence, sufficient to support the ALJ's conclusion that Inmon does not meet the requirements of Listing 1.12.
 
 C. Listing 1.13
 
 20
 Inmon fares no better under Listing 1.13, which involves:
 
 
 21
 Soft tissue injuries of an upper or lower extremity requiring a series of staged surgical procedures within 12 months after onset for salvage and/or restoration of major function of the extremity, and such major function was not restored or expected to be restored within 12 months after onset.
 
 
 22
 20 C.F.R. Part 404, Subpart P, Appendix 1 (pt. A) Sec. 1.13 (1993).
 
 
 23
 The purpose of this listing was discussed in detail in Waite v. Bowen, 819 F.2d 1356 (7th Cir.1987). There we concluded that Listing 1.13 was not meant to deal simply with the loss of the use of an extremity, because other listings deal directly with such loss. Instead, Listing 1.13's emphasis is on the loss of use as a result of surgery. Thus we established in Waite that 1.13 "is directed at the loss of the use of one extremity, not in itself disabling under the regulations, where restoration of function will require repeated staged surgical procedures over a lengthy period, thus making an individual who would otherwise be capable of substantial gainful employment unavailable for work because of these repeated surgical procedures." Id. at 1359 (emphasis added).
 
 
 24
 Inmon argues that he qualifies as disabled under Listing 1.13 because he underwent surgery in January 1990 for the ulnar fracture and had additional surgery in July 1990 for carpal tunnel syndrome. However, these surgeries were for two different conditions and did not occur within 12 months of the February 1987 wrist injury. Thus there was no series of staged surgeries to salvage function, nor did Inmon meet the time constraints of the listing. Further, Inmon's doctor released him to perform light work in September of 1990, thereby dispelling any inference that repeated surgeries caused an inability to work. Therefore, we conclude that the ALJ was justified in finding that Inmon did not meet the requirements of Listing 1.12 or 1.13.
 
 D. Ability to Perform Light Work
 
 25
 Inmon next argues that he can only perform sedentary work and that the conclusion of the ALJ and the district court that he is capable of performing light work is not supported by substantial evidence. The ALJ concluded that Inmon had
 
 
 26
 the residual functional capacity to perform the physical exertional and nonexertional requirements of work except for lifting over 10 pounds frequently and 35 pounds maximum. He can only occasionally climb ladders, ropes, scaffolds, stairs or ramps. He can only occasionally crouch, crawl or kneel. He is mildly limited in his ability to grasp with the right hand and manipulate the right wrist. He cannot perform recurring rapid manipulation with the right hand. He also has borderline intelligence.
 
 
 27
 Tr. 24.
 
 
 28
 This residual functional capacity assessment was supported by the results of the extensive evaluation of Inmon's abilities performed by the Institute of Physical Medicine and Rehabilitation on January 16 and 17th, 1991. However, Inmon argues that the ALJ's conclusions ignore recommendations by his treating physicians that he can perform only sedentary work. Specifically, he refers to two statements by Drs. Kraft and Savegnago. Dr. Kraft, in March of 1992, stated that Inmon "can and should be re-evaluated with Work Hardening and retrained to a more sedentary type occupation ... [t]he patient is physically able to return to some gainful occupation on a sedentary basis but not in his former job." Tr. 292. Dr. Savegnago then stated in a letter in September of 1992 that he agreed with Dr. Kraft's assessment and that "the patient might be able to be retrained at a sedentary type occupation, but not to his former job as an iron worker." Tr. 331. Inmon asserts that these statements establish that he can do only sedentary work, not, as the ALJ concluded, light work.
 
 
 29
 The statements by Drs. Kraft and Savegnago, however, do not clearly indicate that Inmon can do only sedentary work. Instead, they suggest that he should do work that is more sedentary than the duties required in his job as a welder. Thus they do not clearly contradict the evidence from the Institute of Physical Medicine evaluation that Inmon is capable of light work.
 
 
 30
 The more troubling issue is that the Institute of Physical Medicine evaluation took place before Inmon's final knee surgery, raising the concern that the evaluation is unreliable because it does not take his condition after this last surgery into account. But there is no indication that his condition was actually worse after that surgery. Dr. Kraft performed the surgery on January 13, 1992 because he thought that another arthroscopy might improve Inmon's condition. After the surgery, Dr. Kraft indicated that Inmon was no better. However, he did not indicate that Inmon was worse. Thus, absent evidence that Inmon's condition had changed significantly, the evaluation done by the Institute of Physical Medicine and Rehabilitation provides substantial evidence that Inmon is capable of performing light work.[2]
 
 D. Occupational Evaluation
 
 31
 Finally, Inmon argues that the evidence does not support the conclusion that he can perform the jobs suggested by the vocational expert. Specifically, he claims that the hypothetical presented to the expert, on which she based her conclusions, did not accurately reflect Inmon's abilities.
 
 
 32
 The hypothetical in question described Inmon as follows:
 
 
 33
 [A]n individual who is 51 years old, who has a seventh grade education, plus instruction in welding as Mr. Inmon; past relevant work the same as Mr. Inmon, with an exertional capacity limited to a full range of light work with the following exceptions. Only an occasional ability to climb ladders, ropes, scaffolds, stairs or ramps; only an occasional ability to crouch, crawl or kneel; should avoid concentrated exposure to heights; borderline IQ; and mildly limited in the ability to grasp with the dominant right hand and manipulate with the right wrist, so no jobs requiring rapid or frequent manipulation of the right hand and wrist.
 
 
 34
 Tr. 78.
 
 
 35
 "All that is required is that the hypothetical question be supported by the medical evidence in the record." Meredith v. Bowen, 833 F.2d 650, 654 (7th Cir.1987). This hypothetical was based on the ALJ's residual functional capacity finding, quoted above, which was based, in turn, on substantial medical evidence in the record. Therefore, we find the hypothetical to be sufficiently supported by the evidence and to be an appropriate basis on which to determine Inmon's work ability.
 
 
 36
 Inmon also argues that even if the hypothetical was appropriate, the Secretary failed to meet her burden of establishing that there were a significant number of jobs in the national economy that he could perform. The ALJ, adopting the vocational expert's analysis, determined that Inmon could perform three different types of jobs--delicatessen worker, surveillance monitor, and jewelry solderer. Tr. 24. According to the vocational expert there are a total of 1,897 of these jobs in Central Illinois. Even assuming, as the district court did, that jewelry soldering is too fine and detailed for Inmon to perform, there remain in the other two job categories 1,893 jobs in Central Illinois. This number falls within the established range of "significant" job opportunities, and we thus conclude that the Secretary has met her burden of establishing that Inmon can engage in "substantial gainful work which exists in the national economy ... in significant numbers." Lee, 988 F.2d at 792, 794 (1,400 jobs is a significant number; also citing other circuits where numbers of jobs ranging from 174 to 1,000 were found to be significant).
 
 
 37
 Since the findings of the ALJ are thus supported by substantial evidence, the judgment of the district court must be
 
 
 38
 AFFIRMED.
 
 
 
 [1]
 The only injury to the wrist discussed by the district court occurred in February of 1987, so we assume the injury was actually three years old at the time of the surgery
 
 
 [2]
 The ALJ's conclusion that Inmon can perform light work is also supported by a Residual Physical Functional Capacity Assessment done for the state social security agency by Drs. James Graham and Chansoo Kim in January and April of 1992. We note, however, that this Assessment is apparently based solely on medical records in the file; neither doctor appears to have actually examined Inmon