Jeffrey F. NAUDAIN, Plaintiff,

v.

Kenneth S. APFEL, Commissioner
of Social Security, Defendant.

No. 00–3063.

United States District Court,
C.D. Illinois,
Springfield Division.

Oct. 13, 2000.

Gregory A. Oliphant, St. Louis, MO, for plaintiff.

James A. Lewis, Springfield, IL, for defendant.

## OPINION

RICHARD MILLS, District Judge.

A social security appeal.

Denial of benefits.

Defendant's motion for summary affirmance is allowed, and the denial of benefits is affirmed.

But first, the backdrop.

## I. PROCEDURAL BACKGROUND

On April 28, 1994, Jeffrey F. Naudain filed an application for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI"). (Tr. 40–46). Therein, Naudain alleged that he had been disabled since January 15, 1994, due to arthritis in his neck, numbness in his legs, and high blood pressure. (Tr. 48 & 54). On June 24, 1994, the Commissioner denied Naudain's initial application and denied his request for reconsideration on November 17, 1994. (Tr. 48–49 & 54–55).

Accordingly, Naudain requested and received a hearing before Administrative Law Judge ("ALJ") Gerald J. Rickert on August 3, 1995. (Tr. 309–67). At the hearing, Naudain was represented by counsel, (Tr. 311), and ALJ Rickert heard testimony from Naudain and from vocational expert Bonnie Gladden. (Tr. 314–63). On March 29, 1996, ALJ Rickert denied Naudain's application for DIB and SSI. (Tr. 214–21).

However, on May 9, 1997, the Social Security Appeals Council vacated ALJ Rickert's decision and remanded the case to him for further proceedings. (Tr. 234–35). On February 3, 1998, ALJ Rickert conducted a second hearing. (Tr. 368–90). At this hearing,[1] Naudain and his wife, Rutha Naudain, testified.[2] (Tr. 371–88). On October 27, 1998, ALJ Rickert again denied Naudain's application for DIB and SSI. On December 2, 1999, the Appeals

1. Naudain was represented by a non-attorney representative at this second hearing. (Tr. 18 & 370).

2. Although vocational expert Stephen Dolan was present at this second hearing, he did not offer any testimony. (Tr. 388–89).

Council denied Naudain's request for a review of ALJ Rickert's second denial of his application. (Tr. 5–6). Therefore, Naudain has commenced the above-captioned case seeking review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

## II. FACTS

Naudain was born on October 11, 1953, and was 45 years old when ALJ Rickert issued his decision. (Tr. 40). Naudain's past vocational experience consists of work as an automobile mechanic, a truck driver, and a palletizer operator. (Tr. 68). His formal education ceased after he completed the eleventh grade in 1971. (*Id.*).

### A. *MEDICAL EVIDENCE*

In September 1976, Naudain was involved in an automobile accident in which he suffered multiple injuries—including broken arms, broken femurs, injuries to his face, and injuries to his abdomen—and which required hospitalization for nine and ½ months. (Tr. 77). In October 1989, an X-ray of Naudain's right knee showed no evidence of a recent fracture and no interim change in contour or configuration. (Tr. 121). In March 1990, another X-ray showed no meniscal tears or detachments, no extravasation of contrast media outside the joint space capsule, and no popliteal cyst. (Tr. 119). The posterior cruciate appeared to be normal, and although, the anterior cruciate was less well seen, no convincing abnormalities were noted. (*Id.*). However, some benign appearing sclerosis in the distal femoral diaphysis was noted. (*Id.*).

On August 13, 1992, Naudain underwent a cervical spine X-ray based upon his complaints of chest and right arm pain. (Tr. 117). This X-ray revealed some degenerative changes in the cervical spine with mild narrowing at C5–6 and C6–7. (*Id.*). The X-ray also showed spurs at C5–6 and C6–7 which projected into the neural foramina and caused some compromise. (*Id.*). Finally, the chest X-ray revealed that Naudain's heart size was within normal limits and that his lung fields were clear. (*Id.*).

On August 31, 1992, David A. Gelber, M.D., examined Naudain due to complaints of neck and shoulder pain with numbness in his right hand and distal upper extremity. (Tr. 138). Dr. Gelber observed that, although Naudain had limited neck motion, his muscle tone and bulk were otherwise normal throughout, that he had a normal gait, and that he had ⅘ strength throughout. (*Id.*). Dr. Gelber noted that Naudain was currently taking Zestril, 20 mg. a day, Procardia, XL 60 mg. a day, and Motrin, 800 mg every four hours as needed. (*Id.*). Dr. Gelber believed that Naudain's presentation was most consistent with cervical strain or radiculopathy. (Tr. 136). Dr. Gelber recommended that Naudain wear a soft collar and released him to work with the restriction that he not lift over 50 pounds and that he only make one trip to St. Louis, Missouri, per day. (*Id.*).

On October 5, 1992, Dr. Gelber examined Naudain again and noted that his MRI revealed degenerative changes and spinal stenosis at C4–5 and C5–6 but that an EMG did not reveal cervical radiculopathy. (Tr. 134). Dr. Gelber also noted that Naudain was suffering from chronic neck and shoulder pain which was probably secondary to degenerative arthritis related to his previous automobile accident. (*Id.*). Naudain informed Dr. Gelber that, although he wanted to return to work, his employer would not allow his return if there were any work restrictions placed upon him. (*Id.*). Accordingly, Dr. Gelber "recommended that he at least go back and give this [work] a try." (*Id.*).

On April 27, 1994, Dr. Gelber saw Naudain on a follow-up visit. (Tr. 135). Naudain informed Dr. Gelber that he had returned to work but that he had to quit because his pain had intensified. (*Id.*). Dr. Gelber noted that Naudain's range of motion was limited at the neck on extension and on lateral rotation to the left but that his upper extremity strength was normal. (*Id.*). Dr. Gelber opined that Naudain's pain suggested musculoskeletal etiology and was secondary to degenera-

tive arthritis of the cervical spine. (*Id.*).[3] Dr. Gelber recommended a conservative treatment plan. Naudain was to take Elavil, 25 mg. at bedtime and increasing to 50 mg. at bedtime after four to five days. (*Id.*).

On February 1, 1995, Naudain advised Dr. Gelber that he continued to suffer from neck, back, and shoulder pain which worsened when he performed household activities. (Tr. 169). In addition, Naudain complained that lifting and pulling exacerbated his pain. (*Id.*). Dr. Gelber observed tenderness to palpation in the cervical paraspinous muscles bilaterally and trapezius muscles; neck range of motion was full although Naudain experienced discomfort on lateral rotation to the left. (*Id.*). Thereafter, Dr. Gelber increased Naudain's Elavil dosage to 75 mg. (*Id.*).

On July 17, 1995, Naudain complained to Dr. Gelber of pain and numbness in his left lower extremity which began in the lower buttock region and radiated down the back of his leg to his calf. (Tr. 163). Dr. Gelber's examination revealed tenderness to palpation in the left sciatic notch region but no tenderness in the lumbar paraspinous region. (*Id.*). Naudain's straight leg raising test was negative bilaterally, and no abnormalities to pinprick were noted. (*Id.*). Dr. Gelber also noted that the examination suggested the possibility of a pyriformis syndrome with mild irritation of the sciatic nerve in the sciatic notch region, and he recommended that Naudain continue taking 50 mg. of Elavil at bedtime and referred him for physical therapy. (*Id.*).

On August 7, 1995, Dr. Gelber noted that Naudain had only attended one physical therapy session. (Tr. 164). Naudain advised Dr. Gelber that his leg pain had improved significantly since his July 17th visit although his neck and back pain persisted. (*Id.*). Dr. Gelber recommended that Naudain continue taking Elavil as prescribed and to attend the physical therapy sessions to which he had been referred. (*Id.*).

On January 8, 1996, Dr. Gelber saw Naudain who complained of worsening pain in his back which he described as beginning in the left buttock and radiating down the left leg to the knee. (Tr. 206). An MRI taken a few days later revealed moderate sized central and right paracentral HNP which flattens the thecal Sac ventrally. (Tr. 208). However, an EMG and nerve conduction study was normal without evidence of acute or chronic lumbosacral radiculopathy. (Tr. 243).[4]

## B. *JEFFREY NAUDAIN'S TESTIMONY*

Naudain testified at both hearings conducted by ALJ Rickert. (Tr. 314–52 & 371–76). At the first hearing, Naudain testified that he could not perform the tasks of a truck driver because he could not lift the tarps over his head and because "[t]he bouncing up and down [and] the jarring of the truck" caused him a great deal of pain. (Tr. 317). Naudain also testified that he believed that he was incapable of working due to the pain which resulted from the arthritis in his neck which was the result of an automobile accident which he had in 1976. (Tr. 324). He also stated that he had high blood pressure and problems with one of his knees. (Tr. 325). Naudain informed ALJ Rickert that he was taking Procardia, Alivan, Norvac, Elavil, Tylenol, and Ibuprofen which helped to alleviate his pain. (*Id.*, 328, & 339).

Naudain testified that prior to January 15, 1994, he was very active, but now, he could only walk about a block to a block and a half and then he would have to sit down and rest due to the pain (Tr. 328).

---

3. In June 1994 and in October 1994, two separate medical consultants examined Naudain and concluded that he could perform light to medium range of work despite his impairments. (Tr. 87–103).

4. The Court is also aware of and has considered the examinations, diagnoses, and reports from the other medical providers (*e.g.*, Dr. Stuart Frank) which are contained within the Court's file.

He also stated that he did not perform any household chores or any yard work but that he watched television all of the time. (Tr. 330–32). Finally, Naudain testified that he did not drive very much, that he could take care of his own personal hygiene, that he drank alcohol, and that only two days out of the week would be considered "good" days.[5] (Tr. 331–33 & 338).

At the second hearing, Naudain testified that he had not worked since the last hearing. (Tr. 372). Naudain also stated that in addition to his arthritis in his neck, his high blood pressure, and his knee problems, he also has a pain shooting down his legs and arms which affected his ability to work. (Tr. 372–73). Naudain informed ALJ Rickert that he was taking Darvocet, Motrin, Procardia, and Elavil. (Tr. 373). Naudain testified that his pain was excruciating but that his medication did relieve the pain some. (Tr. 375). Naudain stated that he could stand for 45 minutes to an hour but that he had to have something, such as a cane, to hold onto in order to walk. (Tr. 380). Finally, Naudain testified that he did not do much, either inside or outside of the home, other than watch television—and not much of that. (Tr. 377–78 & 385).

### C. *RUTHA NAUDAIN'S TESTIMONY*

Rutha Naudain testified at Naudain's second hearing conducted by ALJ Rickert. (Tr. 386–88). Mrs. Naudain testified that she had been married to Jeffrey Naudain for 18 years. (Tr. 386). She also testified that Naudain had not been employed since 1994. (*Id.*).

Mrs. Naudain stated that since 1994, she had to care for Naudain and perform tasks which he previously had performed, including driving, housework, and yard work, (386–87). Mrs. Naudain testified that her husband has not done much since 1994 and that life has been very stressful since Naudain has been unable to work. (Tr. 388).

### D. *BONNIE GLADDEN'S TESTIMONY*

Vocational expert Bonnie Gladden testified at Naudain's first hearing conducted by ALJ Rickert. ALJ Rickert submitted to Gladden a hypothetical which was based upon Gladden's age, education, past work experience, and medical restrictions. (Tr. 356–57). Gladden opined that a person with the limitations imposed in the hypothetical possessed transferrable skills. (Tr. 357). Specifically, Gladden asserted that the skills possessed by the hypothetical employee could perform work as a dispatcher, either taxi, motor vehicle, or radio. (*Id.*). In addition, Gladden testified that the hypothetical employee could also perform work as a phone order clerk in the food and beverage industry and as a dowel inspector. (Tr. 358–59).

### E. *ALJ'S FINDINGS*

ALJ Rickert found:

1. The claimant met the requirements of the Social Security Act for disability insured status on January 15, 1994, the date the claimant stated he became unable to work, and continues to meet such requirements through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since January 15, 1994.

3. The medical evidence establishes that the claimant has the following medically determinable impairments: degenerative disease of the cervical and lumbar spine and right knee, hypertension, and asthma. The claimant has an impairment or combination of impairments which is "severe" within the meaning of the Social Security Act and Regulations.

4. The claimant does not have an impairment or combination of impairments listed in, or medically equivalent to an impairment listed in, the

---

**5.** On a good day, Naudain stated that his pain level was between five and six on a scale from one to ten, and that on a bad day, his pain level was between eight and nine. (Tr. 339).

Listing of Impairments. Appendix 1, Subpart P, Regulations No. 4.

5. The claimant's statements regarding his subjective symptoms and functional limitations are not fully supported by the medical evidence and are not fully consistent with his daily activities and treatment history, and therefore are not fully credible.

6. The claimant has the residual functional capacity to perform the exertional and nonexertional requirements of work except for lifting or carrying more than 10 pounds frequently or 20 pounds occasionally, frequent pushing and pulling, and sitting or standing more than ½ hour at a time (exertional); and performing work requiring any reaching overhead or exposure to hazardous machinery (nonexertional). 20 C.F.R. § 404.1545 and § 416.945.

7. The claimant is unable to perform any past relevant work.

8. The claimant's residual functional capacity for the full range of light work is reduced by his limitation to occasional pushing and pulling, his inability to sit or stand more that ½ hour at a time, and by the nonexertional limitations listed in Finding No. 6.

9. On January 15, 1994, the claimant was 40 years old, which is defined as a younger individual. 20 C.F.R. § 404.1563 and § 416.964.

10. The claimant has a limited education. 20 C.F.R. § 404.1564 and § 416.964.

11. The claimant has acquired work skills, such as radio operation and log taking, which he demonstrated in past work. Considering his residual functional capacity, these skills can be applied to meet the requirements of skilled or semi-skilled work activities of one or more jobs in the national economy. 20 C.F.R. § 404.1568 and § 416.968.

12. Based on an exertional capacity for light work, and the claimant's age, education, and work experience, Section 404.1568 of Regulations No. 4, Section 416.969 of Regulations No. 16, and Rules 202.21 and 202.22, Table No. 2, Appendix 2, Subpart P, Regulations No. 4, would direct a conclusion of "not disabled."

13. Although the claimant cannot perform the full range of light work, using the above-cited rules as a framework for decision-making, there are a significant number of jobs in the national economy which he can perform.

14. The claimant has not been under a "disability," as defined in the Social Security Act, at any time from January 15, 1994, through the date of this decision. 20 C.F.R. § 404.1520(f) and § 416.920(f).

### III. LAW AND STANDARD OF REVIEW

■ In order to be entitled to DIB, the claimant generally must show that his inability to work is medical in nature and that he is disabled. DIB is meant only for "sick" or "disabled" persons and is not intended to be a surrogate unemployment insurance or a welfare program. *Jones v. Shalala,* 10 F.3d 522, 526 (7th Cir.1993). Thus, economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether the claimant is eligible for DIB. *Id.*

■ Establishing disability under the Social Security Act is a two-step process. First, the claimant must be suffering from a medically determinable physical or mental impairment, or combination of impairments "which can be expected to result in death or which have lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A).

Second, there must be a factual determination that the impairment renders the claimant unable to engage in any substantial gainful employment. *McNeil v. Califano,* 614 F.2d 142, 143 (7th Cir.1980).

■ The factual determination is made using a five-step test. The steps are examined in order as follows:

1. Is the claimant presently employed?
2. Is the claimant's impairment "severe?"
3. Does the impairment meet or exceed one of a list of specified impairments?
4. Is the claimant able to perform his former work?
5. Is the claimant able to perform any other work in the national economy?

20 C.F.R. §§ 404.1520, 416.920; *Knight v. Chater,* 55 F.3d 309, 313 (7th Cir.1995). If the claimant can satisfy steps one, two, and three, he "will automatically be found disabled." *Knight,* 55 F.3d at 313. If the claimant "satisfies steps one and two, but not three, then he must satisfy step four." *Id.* If the claimant satisfies step four, the burden shifts to the Commissioner to establish that the claimant is capable of performing other work in the national economy, *i.e.* step five. *Id.* If the Commissioner establishes that the claimant can perform other work in the national economy, DIB will be denied.

■ The Court's function on review is not to try the case *de novo* or to supplant the ALJ's findings with the Court's own assessment of the evidence. *Pugh v. Bowen,* 870 F.2d 1271, 1274 (7th Cir.1989). The Court must only determine whether the ALJ's findings are supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen,* 782 F.2d 79, 82 (7th Cir.1986). In determining whether the ALJ's findings are supported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401,

91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). A credibility determination by the ALJ will not be disturbed unless it is "patently wrong." *Luna v. Shalala,* 22 F.3d 687, 690 (7th Cir.1994).

## IV. ANALYSIS

Naudain has raised only one issue to this Court. Specifically, Naudain argues that he is entitled to relief from the Commissioner's final decision denying his application for DIB and SSI because the record fails to support ALJ Rickert's conclusion that he can perform other jobs in the national economy. Naudain contends that the record is void of any evidence, either from a vocational expert or from some other source, which was presented at the second hearing which would justify ALJ Rickert's finding. Accordingly, Naudain argues that the Commissioner's decision is not supported by substantial evidence and that he is entitled to relief from the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

Naudain is correct that no evidence was presented at the second hearing, by a vocational expert or otherwise, regarding the type(s) of job(s), if any, he could perform and which existed in substantial numbers in the national economy. Furthermore, Naudain is correct that the Commissioner has the burden of establishing that he could perform jobs which are available in the national economy. *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir.1994); *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir.1987).

■ However, the Commissioner can satisfy this burden *via* the testimony of a vocational expert addressing whether there are a significant number of jobs which the particular claimant can actually perform. *DeFrancesco v. Bowen,* 867 F.2d 1040, 1045 (7th Cir.1989). Moreover, an ALJ may properly rely upon evidence presented at a prior hearing in making his determination. *See Wolfe v. Chater,* 86 F.3d 1072, 1079 (11th Cir.1996) (finding "that the third ALJ's examination of the conflicting vocational expert testimony

from the two prior hearings was appropriate ....."); *see also Woolf v. Sullivan,* 1992 WL 533050, *7 (E.D.Mo. Oct.19, 1992) (finding that substantial evidence existed for the ALJ's conclusion based upon the vocational expert's testimony at a prior hearing).

 Here, vocational expert Bonnie Gladden testified in response to a hypothetical posited by ALJ Rickert at Naudain's first hearing that a substantial number of jobs existed within the national economy for an individual with Naudain's residual functional capacity. Specifically, Gladden testified that an individual of Naudain's age, education, work experience, and limitations could perform work as a dispatcher (either taxi, motor vehicle, or radio), as a phone order clerk in the food and beverage industry, and/or as a dowel inspector.[6] Gladden also testified that 20,-134 dispatcher jobs existed in Illinois with 784 in the subregion around Sangamon County, Illinois; that 19,084 phone order clerk jobs existed in Illinois with 698 in the subregion of Sangamon County; and that 23,747 dowel inspector jobs existed in Illinois with 824 in the subregion of central Illinois.

Hypotheticals are appropriate if supported by the medical evidence in the record. *Cass v. Shalala,* 8 F.3d 552, 555–56 (7th Cir.1993). The Court believes that the medical evidence clearly supported the hypothetical presented by ALJ Rickert to Gladden. The hypothetical described Naudain's age, education, previous work experience, medical impairments, limitations, and restrictions and then inquired as to what types of employment, if any, a person suffering from these impairments, limitations, and restrictions could perform. Gladden responded by naming three types of jobs which Naudain could perform and listed the availability of those jobs in the national economy.

The Court finds that the number of jobs cited by Gladden and relied upon by ALJ

Rickert is significant and supports the ALJ's decision. *Lee v. Sullivan,* 988 F.2d 789, 794 (7th Cir.1993) (1,400 jobs significant). Furthermore, Gladden's testimony was uncontradicted and, therefore, constitutes substantial evidence supporting the ALJ's decision. *Meredith v. Bowen,* 833 F.2d 650, 654 (7th Cir.1987). Accordingly, the Court finds that ALJ Rickert's decision is supported by substantial evidence and that he applied the proper legal standards in making his decision.

*Ergo,* Defendant's Motion for Summary Affirmance is ALLOWED.

---

**6.** Naudain has not challenged any part of ALJ Rickert's hypothetical or any part of Glad-den's testimony.