Norma MASON, Plaintiff,

v.

**Kenneth S. APFEL, Commissioner of the Social Security Administration, Defendant.**

Civil Action No. 97–30134–MAP.

United States District Court, D. Massachusetts.

April 10, 1998.

Terrence A. Low, Rosen, Greenhut, Catugno & Low, Springfield, MA, for Plaintiff.

Ariane D. Vuono, U.S. Attorney's Office, Springfield, MA, for Defendant.

PONSOR, District Judge.

Upon *de novo* review this Report and Recommendation is hereby adopted and the case is remanded pursuant to 42 U.S.C. § 405(9), sentence four. So ordered.

*REPORT AND RECOMMENDATION WITH REGARD TO PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER (Docket No. 7) AND DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER (Docket No. 6)*

March 9, 1998.

NEIMAN, United States Magistrate Judge.

This matter is before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act (the "Act"), which provides for judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") regarding an individual's entitlement to disability benefits. Norma Mason ("Plaintiff") is seeking Social Security Disability Insurance ("SSDI") benefits under Title II of the Act, 42 U.S.C. § 401 *et seq.* Plaintiff alleges that the Commissioner's decision denying her benefits is not supported by substantial evidence and has moved to reverse the decision. The Commissioner has moved for an order affirming the decision. The parties' motions have been referred to the court for a report and recommendation pursuant to Rule 3 of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts. 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, the court recommends that the case be remanded for further review by the Commissioner.

## I. BACKGROUND

### A. Medical History

Plaintiff was born on April 4, 1956. She is a high school graduate and a licensed cosmetologist. (Administrative Record ("A.R.") at 47.) After acquiring her cosmetology license, Plaintiff worked mainly as an institutional cook and cook supervisor. (A.R. at 17, 47.)

On August 26, 1991, while employed as a cook, Plaintiff suffered a back injury and was treated at the emergency room of Mercy Hospital. (A.R. at 46, 262–66.) Following that treatment, Plaintiff received physical therapy from September to December of 1991. (A.R. at 267–84.) Although the therapy provided some relief, Plaintiff still complained of having severe pain in her back and foot. As a result, she began treatment with Dr. Jay Krompinger, an orthopedic surgeon, on November 9, 1992. (A.R. at 267–97.) Dr. Krompinger prescribed a back brace to relieve Plaintiff's pain. When Plaintiff continued to complain of severe pain, Dr. Krompinger recommended surgery to correct what he diagnosed as lumbar degenerative disc disease. (A.R. at 287, 290–91, 302.)

On March 8, 1993, Plaintiff underwent surgery, resulting in a spinal fusion. (A.R. at 302.) In his post-operative report of May 21, 1993, Dr. Krompinger found that Plaintiff was no longer experiencing pain in her back and leg but complained of pain in her foot. Overall, however, Dr. Krompinger was pleased with Plaintiff's progress and scheduled her for physical therapy. (A.R. at 292.) During several follow-up visits, Dr. Krompinger noted that the pain in Plaintiff's back and leg had not reappeared. The only pain

Plaintiff complained of was in her foot. (A.R. at 292–97.) Pleased with Plaintiff's success, Dr. Krompinger scheduled surgery for the removal of the hardware he installed during the spinal fusion. (A.R. at 296.)

The hardware was surgically removed on May 9, 1994. In his post-operative report, Dr. Krompinger noted his pleasure with Plaintiff's progress, but was unable to determine the source of the continued pain in her foot. (A.R. at 297.) Accordingly, Dr. Krompinger referred Plaintiff to Dr. Steven Schutzer, an orthopedic surgeon. (A.R. at 297.) Dr. Schutzer examined Plaintiff on October 18, 1994, and diagnosed her as suffering from piriformis syndrome. He reported that Plaintiff was experiencing pain in her left buttocks that radiated down to her foot and recommended another surgery. (A.R. at 298.) Refusing to undergo further surgery, Plaintiff commenced acupuncture treatments for her pain. (A.R. at 76, 334.)

Plaintiff also began counseling with Gerald Moreau, a counselor at Longview Associates. Her counseling sessions ran from February 1, to April 14, 1995. Moreau noted that Plaintiff complained of both pain and depression and concluded that she was in need of more intensive counseling. In April of 1995, Moreau referred Plaintiff to Shanti Shapiro, a licensed social worker, (A.R. at 360), who treated her on a weekly basis from April of 1995 to March of 1996. In a later report, Shapiro noted that Plaintiff had no prior history of psychiatric treatment, but that she often cried during sessions and voiced suicidal thoughts. (A.R. at 361–374.)

In January of 1996, Shapiro referred Plaintiff to Dr. Kenneth Jaffe for a psychiatric evaluation. Dr. Jaffe examined Plaintiff on behalf of the Massachusetts Department of Industrial Accidents as an impartial medical examiner. (AR.97.) After describing Plaintiff's tragic family history, Dr. Jaffe diagnosed Plaintiff as suffering from major depressive and generalized anxiety disorders and opined that she was disabled. (A.R. at 325–328.) He also reported that Plaintiff's

depression was related to the pain she was experiencing, the triggering event being her back injury in August of 1991. (A.R. at 327.) Dr. Jaffe concluded that Plaintiff had not reached a medical end result with respect to her emotional impairment and advised that she undergo anti-depressant and anxiety therapy. (A.R. at 328.)

### B.   Procedural History

On November 5, 1992, Plaintiff filed the first of three applications for SSDI. (A.R. at 146.) Plaintiff alleged that she became disabled and unable to work as of August 26, 1991, due to the back injury suffered at work. On December 11, 1992, the Commissioner denied Plaintiff's first application, finding that she could perform sedentary work with restrictions on lifting. The Commissioner concluded that, although Plaintiff could not return to her previous job as a cook, there was other work in the national economy she could perform. (A.R. at 133–37.) Plaintiff did not appeal that determination.

On October 22, 1993, Plaintiff again applied for SSDI, making the same claim as in her previous application. (A.R. at 169–80.) The Commissioner denied Plaintiff's application on January 12, 1994, setting forth the same reasons as in his previous denial. (A.R. at 164–68.) Plaintiff's February 15, 1994 request for reconsideration was denied on March 23, 1994. (A.R. at 150–63.) On June 7, 1994, Plaintiff requested a hearing before an administrative law judge, but the request was dismissed as untimely on June 22, 1994. (A.R. at 181–184.) [1]

On August 19, 1994, Plaintiff filed her third application for SSDI. (A.R. at 186–89.) As with her previous applications, Plaintiff alleged that she became disabled due to degenerative disc disease and unable to work since her accident on August 26, 1991. (A.R. at 186–188.) This application was denied on October 20, 1994, for the same reasons as the two previous denials. (A.R. at 190–205.) On November 29, 1994, Plaintiff retained counsel

---

1. A claimant's request for an administrative hearing must be made within sixty days from the date of the last determination, 20 C.F.R. § 404.933(b)(1), although a claimant can seek an extension for good cause. 20 C.F.R. § 404.933(c) Plaintiff requested an extension on grounds of pain from recent surgery. (A.R. at 296.) The administrative law judge deemed this as an inadequate showing of good cause and dismissed Plaintiff's request. (A.R. at 184.)

and on December 15, 1994, filed an application for reconsideration. (A.R. at 206.) Again the Commissioner concluded that Plaintiff was not disabled and, on February 3, 1995, denied her request for reconsideration. (A.R.208–219.)

On February 17, 1995, Plaintiff requested an administrative hearing. (A.R. at 220, 223–252.) A hearing was conducted before Administrative Law Judge ("ALJ") John F. Aronson on March 6 and June 4, 1995, and included testimony from the Plaintiff, a vocational expert, David Soja, and Dr. Jaffe. (A.R. at 26–132.)

On June 7, 1995, the ALJ issued his findings. He first determined that Plaintiff had not presented good cause to reopen any of her prior applications. The practical effect of that determination was to limit the ALJ's period of review from March 23, 1994, when Plaintiff's request for reconsideration of her second application was denied, to December 31, 1994, the date that Plaintiff's insured status for purposes of SSDI eligibility expired. (A.R. at 13.) After reviewing the evidence, the ALJ concluded that Plaintiff was not disabled during this period and denied her claim. (A.R. at 13–21.)

Plaintiff requested a review of the ALJ's decision by the Commissioner's Appeals Council. (A.R. at 5.) On May 22, 1996, the Appeals Council denied Plaintiff's request, thereby making the ALJ's decision the final decision of the Commissioner. Plaintiff then filed her complaint in this court.

## II. STANDARD OF REVIEW

A court may not disturb the Commissioner's decision if it is grounded in substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Rodriguez v. Secretary of Health & Human Services,* 647 F.2d 218, 222 (1st Cir.1981). The Supreme Court has defined substantial evidence as "more than a mere scintilla." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. Nat'l Labor Relations Bd.,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Thus, even if the administrative record could support multiple conclusions, a court must uphold the decision of the Commissioner if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion. *Irlanda Ortiz v. Secretary of Health & Human Services,* 955 F.2d 765, 769 (1st Cir. 1991) (quoting *Rodriguez,* 647 F.2d at 222). Accordingly, a court must affirm the decision so long as it is supported by substantial evidence, even if the record could arguably justify a different result. *Rodriguez Pagan v. Secretary of Health & Human Services,* 819 F.2d 1, 3 (1st Cir.1987). However, a denial of a claim for benefits need not be upheld if there has been an error of law in the evaluation of the particular claim. *See generally Manso–Pizarro v. Secretary of Health & Human Services,* 76 F.3d 15, 16 (1st Cir.1996).

## III. DISCUSSION

An individual is entitled to SSDI benefits if he is under a disability prior to the expiration of his insured status. *See* 42 U.S.C. §§ 423(a) and (d); *Torres v. Secretary of Health & Human Services,* 845 F.2d 1136, 1137–38 (1st Cir.1988); *Cruz Rivera v. Secretary of Health & Human Services,* 818 F.2d 96, 97 (1st Cir.1986). "Disability" is defined, in applicable part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, or a combination of impairments, which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 416(i)(1) and 423(d)(1). *See generally Bowen v. Yuckert,* 482 U.S. 137, 146–48, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

The Commissioner uses a sequential five-step analysis to determine whether a claimant is disabled. The analysis proceeds on the basis of the following questions:

First, is the claimant currently employed? If he is then claimant is automatically considered not disabled.

Second, does the claimant have a severe impairment? A "severe impairment" means an impairment "which significantly limits his or her physical or mental capaci-

ty to perform basic work-related functions." If the claimant does not have an impairment of at least this degree of severity, he is automatically considered not disabled.

Third, does the claimant have an impairment equivalent to a specific list of impairments contained in the regulations' Appendix 1? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled...

Fourth, does the claimant's impairment prevent him from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.

Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy? If so, he is disabled; if not, he is not disabled.

*Goodermote v. Secretary of Health & Human Services,* 690 F.2d 5, 6 (1st Cir.1982) (citing 20 C.F.R. § 416.1520). *See also McDonald v. Secretary of Health & Human Services,* 795 F.2d 1118, 1120 (1st Cir.1986).

■ In the present matter, the ALJ proceeded through all five steps. He found that, prior to the expiration of her insured status on December 31, 1994, (1) Plaintiff had not engaged in substantial gainful activity since March 23, 1994, (A.R.14), (2) that, although Plaintiff's back problems were severe, (id.), (3) her physical problems did not equal a listed impairment, (A.R.19), and, (4) although Plaintiff was unable to perform her past relevant work as an institutional cook, (A.R. 20), (5) she had the residual functional capacity to perform other work in the national economy. (Id.) In reaching this conclusion, the ALJ rejected the severity of Plaintiff's mental impairment during the critical time period. The ALJ found that "it is most reasonable to set the onset of [Plaintiff's] depression in February, 1995, the month she first saw Mr. Moreau, and to set the onset of her disabling

symptoms due to depression in January, 1996, the month she first saw Dr. Jaffe." (A.R. 16.) Both dates followed the expiration of Plaintiff's insured status on December 31, 1994.[2]

Plaintiff does not base her appeal to this court on the disabling nature of her degenerative back disease or the resulting pain. Rather, Plaintiff concentrates her appeal on her mental impairment on the assumption that its onset date is determinative for purposes of SSDI eligibility. Relying on Dr. Jaffe's evidence, Plaintiff claims that the onset of her mental illness was as early as May of 1994 when her second surgery assertedly failed. Alternatively, Plaintiff avers that the ALJ committed an error of law when, in contravention of the requirements of Social Security Ruling ("SSR") 83–20, he failed to seek the opinion of a medical advisor when confronting an uncertain date of onset. The court bases its recommendation on Plaintiff's second argument.

■ In large part, the ALJ relied on SSR 83–20 in making his decision.[3] (A.R.15.) SSR 83–20 advises that the determination of onset is critical because "it may affect the period for which the individual can be paid and may even be determinative of whether the individual is entitled to or eligible for any benefits.... Consequently, *it is essential that the onset date be correctly established and supported by the evidence* ..." SSR 83–20 (emphasis added). The onset date is defined as "the first day an individual is disabled as defined by the Act and the regulations." Id.

The starting point of an SSR 83–20 analysis is whether the alleged impairment is of traumatic or non-traumatic origin. When the impairment is of traumatic origin, the date of onset is self-evident. *See Field v. Secretary of Health & Human Services,* No. Civ. 93–289–B, 1994 U.S. Dist. WL 485781, at *2 (D.N.H. Aug. 30, 1994). An impairment

---

**2.** Apparently, Plaintiff has not applied for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, eligibility for which is not dependent on an insured status. One need only be in financial need and, of course, disabled in order to receive SSI. *See* 42 U.S.C. §§ 1381a, 1382c(a)(3).

**3.** Once published, a ruling is binding on the Social Security Administration. *Heckler v. Edwards,* 465 U.S. 870, 873 n. 3, 104 S.Ct. 1532, 79 L.Ed.2d 878 (1984); *McDonald v. Secretary of Health & Human Services,* 795 F.2d 1118, 1125 (1st Cir.1986). *See also Lichter v. Bowen,* 814 F.2d 430, 435 n. 5 (7th Cir.1987).

of non-traumatic origin, on the other hand, requires a three part analysis. SSR 83–20 explains:

> Factors relevant to the determination of disability onset include the individual's allegation, the work history, and the medical evidence. These factors are often evaluated together to arrive at the onset date. However, the individual's allegation or the date of work stoppage is significant in determining onset only if it is consistent with the severity of the condition(s) as shown by the medical evidence.

SSR 83–20. *See also Ott v. Chater,* 899 F.Supp. 550 (D.Kan.1995); *Pugh v. Bowen,* 870 F.2d 1271, 1274 (7th Cir.1989).

As to the first analytical step, claimant's allegations, Plaintiff consistently based her SSDI applications not on her mental impairment, but on her degenerative disc disease, which she asserted became disabling when she injured her back on August 26, 1991. It became clear by the time of her administrative hearing, however, that Plaintiff's claim for SSDI was based, in large part, on her mental impairment. *See* Reconsideration Disability Report (A.R. 239) ("I'm very depressed from the results of 2 back surgerys [sic]."); Statement Upon Request for Hearing (A.R. 255) ("I am now seeing a psychotherapist for increased depression.") Indeed, the hearing itself explored Plaintiff's mental impairment in depth, not only through Plaintiff's testimony, (A.R. 56—63), but the testimony of Dr. Jaffe as well. (A.R. 96–120.)

As to the second prong of the analysis, work history, it is only determinative of onset when it is consistent with both the claimant's allegations and the medical evidence. *See* SSR 83–20. As the ALJ determined, that is not quite the situation here. Although Plaintiff had not worked since August of 1991, she consistently attributed her work stoppage to her physical, not her mental, impairment. However, she first received counseling for depression on February 1, 1995, long after she stopped working. That date, standing alone, is of little help in determining when Plaintiff's mental impairment became disabling.

With respect to the third part of the SSR 83–20 analysis, significant medical evidence regarding Plaintiff's mental impairment was provided by Dr. Jaffe. In fact, it was the only medical evidence before the ALJ regarding the onset of that impairment. In a letter dated May 8, 1996, Dr. Jaffe indicated that, "[b]ased on my evaluation of January 9, 1996 and a review of her medical records, I feel that to a reasonable medical certainty this woman's psychiatric problems have been severe and disabling at least since her surgery of May 1993 and quite possibly earlier." (A.R. 389.) Dr. Jaffe, acting as an impartial medical examiner for the Department of Industrial Accidents, had indicated on January 9, 1996 that Plaintiff suffered from a major depressive disorder. (A.R. 327.)

Dr. Jaffe reiterated his diagnosis, this time with an onset date in 1994, at the administrative hearing on June 4, 1996. (A.R. 96–103.) Under careful questioning by the ALJ, Dr. Jaffe explained that his conclusion about the onset of Plaintiff's mental impairment was based on Plaintiff's "history of chronic pain, her history of chronic severe anxiety and chronic severe depressive symptoms," (A.R. 103), all rooted in several serious back surgeries. (A.R. 106.) This history included, but was not limited to, Moreau's report that Plaintiff had "feelings of depression and debilitating, chronic pain" in the early part of 1995. (A.R. 107), as well as Shapiro's notes which, Dr. Jaffee testified, "seem to paint a picture of [Plaintiff] having a significant amount or distress and significant amount of pain and a significant amount of difficulty functioning" shortly thereafter. (Id.)

After acknowledging that the evidence of Plaintiff's pain was significant, the ALJ asked, "[w]hat I'm trying to separate is the limitations, the physical limitations associated with her pain ... and the limitations that are attributable to depression," (A.R.108), to which Dr. Jaffe responded:

> To attempt to maybe clarify and speak to your question more effectively, basically when someone comes in to see me for an impartial psychiatric evaluation I review their records. I take a history. I administer various well established symptom rating scales and in this case the patient's self

report, her history, her mental status examination, her responses to the Beck and Zung self rating scales all seem to point in the same direction. I didn't see that she was telling me one thing in the records or telling me something very different, or she was telling me one thing and her response to the rating scales were telling me something different. It seemed as thought all the pieces of information that I had seem to line up in a fairly clear manner pointing to a picture that I see not infrequently in which an individual that has been previously functioning at a good level suffers an injury and then for any of a number of reasons goes downhill psychiatrically and becomes psychiatrically disabled. I think in this woman's particular case as I think I may have hypothesized in my report, the fact that she had a number of pretty traumatic things that went on in her life that nevertheless she managed to cope with by working very hard and being very busy, in my experience when folks like this who are somewhat of workaholics and constantly busy and active as a way of dealing with everything, when they lose their ability to be busy all the time, not infrequently they fall apart psychologically and I think that to some degree this injury had a much more devastating psychiatric effect on this woman than it would have had had she not had that kind of a constellation of factors if I'm explaining it in an understandable way. (A.R.108–109.) With that response, the ALJ identified the "real question," which he characterized as "how close the nexus is between the onset of [Plaintiff's] important depressive symptoms and the date of her last surgery," (A.R.109–110), acknowledging that "it could be tight or it could be fairly loose." (Id.)

The ALJ then asked Dr. Jaffe to identify what elements "create[d] the nexus between the severity of her symptoms and her date last insured which is December 31, 1994." (A.R.110.) Dr. Jaffe explained that nonpsychiatric physicians, like those who treated Plaintiff prior to December 31, 1994, "rarely ... talk about psychiatric issues in their reports and relatively infrequently will they refer someone for psychiatric consultation or treatment unless something catastrophic is going on." (A.R.110.) He went on to explain

the delay in Plaintiff's seeking consultation until February of 1995:

> Well, there's not a whole lot of time between December 31, 1994 and February 1, 1995. I mean I think that, you know, the fact that she was reporting serious symptoms as early as February '95 would certainly be a factor which would kind of corroborate the story that led to my impression. Again, there are times when I rely very heavily on one or more piece of information in the record and say, gee, this really was an important factor and my coming to my conclusion. I do not recall doing that in this case. I do not recall being particularly struck by any report or series of reports that had a major impact. I think it was more the totality of the record. Plus the patient's history, the mental status examination, the Beck score, the Zung score. All those things kind of came together and seem to point to a fairly consistent story that made sense to me.

(A.R. at 118.)

Despite Dr. Jaffe's testimony, the ALJ concluded that Plaintiff did not establish that her mental impairment was either severe or disabling while she was insured. (A.R.16.) Although he appreciated the nature and severity of Plaintiff's mental impairment, the ALJ found it disabling only as of January 1996, when Plaintiff first met with Dr. Jaffe. As the ALJ noted, and the Commissioner now maintains, (1) Plaintiff, upon application, did not cite a mental condition as a basis for her inability to work, (A.R.186), (2) Plaintiff did not seek any treatment for her mental condition until after the expiration of her insured status on December 31, 1994, (3) prior to 1995 none of Plaintiff's treating physicians mentioned a mental condition or referred her for mental health treatment, and (4) it was not until 1996 that a psychiatric diagnosis was made. This, the Commissioner argues, provided substantial evidence for the ALJ's finding that Plaintiff did not have a medically determinable impairment before the expiration of her insured status on December 31, 1994. The court disagrees.

The court believes that the ALJ did not have a legitimate medical basis for his con-

clusion. SSR 83–20 requires that, "[w]hen the medical or work evidence is not consistent with the allegation [of onset by the claimant], additional development may be needed to reconcile the discrepancy." It then goes on to explain:

> In some cases it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case.

SSR 83–20. Here, however, rather than determining whether Plaintiff's alleged date of onset was consistent with the evidence of record, the ALJ simply concluded that it was *not* possible to infer the onset date from Dr. Jaffe's evidence. As a result, the ALJ rejected the onset date proffered by Dr. Jaffe and imposed his own, the day Plaintiff first saw Dr. Jaffe in January of 1996. The ALJ's approach was wrong as a matter of law. Lacking a legitimate medical basis, the ALJ's judgment was not "informed."

Given the record available to the ALJ, the onset date of Plaintiff's mental impairment was, at best, ambiguous. When the date of onset is ambiguous, SSR 83–20 suggests that the ALJ seek the services of a medical advisor: "At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred." In fact, many courts have held that the services of a medical advisor are mandated in such instances. *See Bailey v. Chater,* 68 F.3d 75, 79 (4th Cir.1995); *Spellman v. Shalala,* 1 F.3d 357, 363 (5th Cir.1993); *De-Lorme v. Sullivan,* 924 F.2d 841, 848 (9th Cir.1991); *Ott,* 899 F.Supp. at 553. That did not happen here.

Of course, when *no* legitimate medical basis can support an inference of disability, no medical advisor is necessary. In the present matter, however, the medical evidence of record indicated that Plaintiff's depression was noted by a counselor one month after the expiration of her insured status. In addition, the record showed that Plaintiff was treated

by a licensed social worker for approximately one and one-half years after the expiration of her insured status, that Plaintiff was diagnosed with a major depressive disorder one year after the expiration of her insured status, and that Plaintiff was considered by the diagnosing psychiatrist to have been disabled by her depression well before the expiration of her insured status. This evidence should have caused the ALJ to scrutinize the Commissioner's denial of benefits carefully and consult a medical advisor.

■ It is self-evident that mental illness usually proceeds along a slow and progressive course. *See Morgan v. Sullivan,* 945 F.2d 1079, 1082 (9th Cir.1991) ("Mental disorders may manifest themselves over a period of time.") As SSR 83–20 recognizes, the onset date of a mental, as distinct from a physical, illness can be particularly problematical. With respect to hospitalized mental patients, for example, SSR 83–20 notes that "[d]epending on the nature of events leading to institutionalization, onset of disability may sometimes be found at a time considerably in advance of admission." Similarly here, there is no magic to the day that Plaintiff first saw Dr. Jaffe in January of 1996, as the ALJ seems to assume. It is more likely than not that Plaintiff's impairments did not become disabling on the exact date she was examined by Dr. Jaffe or, for that matter, when she first visited Moreau at Longview Associates on February 4, 1995. Chronic mental impairments of the type suffered by Plaintiff must be examined longitudinally. *Cf.* 20 C.F.R. pt. 404 Appendix I to Subpart P, § 12.00(E). "[T]he fact that [P]laintiff was not treated for h[er] symptoms until long after the symptoms first appeared does not preclude the possibility that [P]laintiff became disabled before [s]he received treatment." *Ott,* 899 F.Supp. at 553.

SSR 83–20 also explains, again with respect to hospitalized mental patients, that "[i]t is not unusual for the history to show that prior to hospitalization the person manifested personality changes such as refusing to go out of the house, refusing to eat, accusing others of being against him or her, threatening family and neighbors, etc. In such a case, a beginning date prior to hospitalization could be reasonable unless contradicted by the work history or other evi-

dence." Similarly here, it is reasonable to infer that the onset date of Plaintiff's mental impairment was earlier than her appointment with Dr. Jaffe. Indeed, it may be the only reasonable inference. Although she herself could not pinpoint the date of onset, (A.R. 125–126), Plaintiff's traumatic history, (A.R. 61–62), long-term depression, (A.R. 56–57, 126–127), and attempt at suicide in 1991, (A.R.57, 62), corroborate Dr. Jaffe's analysis that the date of onset arose significantly before her appointment with him or, for that matter, with Moreau.

Most importantly, as described, Plaintiff provided the ALJ with sufficient medical evidence through Dr. Jaffe to infer that she was disabled by her mental illness prior to December 31, 1994. That evidence is particularly significant when coupled with Plaintiff's own description of her depression, including a suicide attempt in 1991, and the fact that she ceased working in 1991. In light of the cumulative evidence, the ALJ's reasoning that the absence of medical records from the relevant period rendered Dr. Jaffe's medical evidence too speculative a basis to establish a severe impairment is flawed. *See Arnone v. Bowen*, 882 F.2d 34, 39 (2d Cir.1989) (noting that the dearth of contemporaneous evidence does not necessarily preclude claimant's entitlement to a period of disability); *Deblois v. Secretary of Health & Human Services*, 686 F.2d 76, 81 (1st Cir.1982) (remanding for administrative law judge to obtain retrospective opinions regarding claimant's mental condition in relevant period).

■ Where, as SSR 83–20 directs, the onset date must be inferred from the medical and other evidence describing the history and symptomatology of the disease process, the administrative law judge is required to retain the assistance of a medical advisor.

*See Pugh*, 870 F.2d at 1278 n. 9. Without that assistance, the administrative law judge does not have an adequately developed record upon which to base his decision. *Grebenick v. Chater*, 121 F.3d 1193, 1201 (8th Cir.1997). In the court's opinion, the ALJ's failure to obtain a medical advisor in the instant case is a legal error requiring remand. *See Manso–Pizarro*, 76 F.3d at 16 (denial of benefits is to be upheld when "the Secretary has committed a legal or factual error in evaluating a particular claim.") (quoting *Sullivan v. Hudson*, 490 U.S. 877, 885, 109 S.Ct. 2248, 104 L.Ed.2d 941 (1989)).

### IV. CONCLUSION

For the reasons stated, the court recommends that both parties' motions be DENIED and that the case be REMANDED pursuant to 42 U.S.C. § 405(g) for a further hearing consistent with this report.[4]

---

**4.** The Parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of Court within ten (10) days of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of

Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Secretary of Health & Human Services*, 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete*, 792 F.2d 4,6 (1st Cir.1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega*, 678 F.2d 376, 378–379 (1st Cir.1982); *Park Motor Mart v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir.1980); *See also Thomas v. Arn*, 474 U.S. 140, 154–55, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.